UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SHEILA EL-AMIN, *et al.*, <br><br> Plaintiffs/Relators, <br><br> v. <br><br> THE GEORGE WASHINGTON UNIVERSITY, <br><br> Defendant. | Civil Action No. 95-02000 (CKK) (JMF) |

MEMORANDUM OPINION
(November 25, 2013)

Relators Sheila El-Amin, Joyce Lasley, Katherine Linden, and Robert Roubik are four certified registered nurse anesthetists ("CRNAs") formerly employed by Defendant, the George Washington University ("GWU"). They bring this *qui tam* action against GWU on behalf of the United States, alleging that GWU violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, by submitting false claims for reimbursement for anesthesia procedures to Medicare. Relators contend that these claims were false because GWU allegedly sought reimbursement from Medicare under the pretense that the anesthesia procedures had been wholly performed by a licensed anesthesiologist when parts had actually been performed by residents or CRNAs.

Presently before the Court is Defendant GWU's [797] Motion for Summary Judgment, which seeks summary judgment on the remaining claims of Relators' Third Amended

Complaint. Upon careful consideration of the parties' submissions,[1] the relevant authorities, and the record as a whole, GWU's Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

This case has been actively litigated for over eighteen years, during which time three district judges and two magistrate judges have issued myriad rulings that have culminated in the pending motion. Although the Court assumes familiarity with the many prior opinions and orders detailing the background of this protracted action, it provides here a relevant summary of the facts and procedural developments that have led to this point.[2]

### A. The Remaining Claims

For all practical purposes, the story of this case in its present form began on June 5, 1998, when Relators filed the fourth and final iteration of their Complaint. *See* Third Am. Compl., ECF No. [42] ("Compl."). The Complaint, in this final iteration, asserted three overarching claims. Relators' First Claim asserted that GWU has "knowingly presented, or caused to be presented, to officers or employees of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)[3]." *Id.* ¶ 63. Relators' Second Claim asserted that GWU "knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims approved by the Government in violation of 31

---

[1] Mem. & Stmt. of Undisp. Facts in Supp. of GWU's Mot. for Summ. J., ECF No. [797-1] ("GWU's Mem."); Relators' Opp'n. to Def.'s Mot. for Summ. J., ECF No. [798] ("Relators' Opp'n."); Reply in Supp. of GWU's Mot. for Summ. J., ECF No. [799] ("GWU's Reply").
[2] Much of the factual and procedural background recited herein is restated from the Court's [778] August 27, 2012 Memorandum Order and [789] June 14, 2013 Memorandum Order, both of which contain a comprehensive discussion of the factual and procedural background of this case up through the pretrial stage.
[3] Consistent with the parties' usage, the Court shall refer to the versions of the United States Code and Code of Federal Regulations in effect at the time of the underlying conduct.

U.S.C. § 3729(a)(2)." *Id.* ¶ 65. Relators' Third Claim asserted that GWU "conspired" with three national anesthesiologist associations to "defraud" the federal government. *Id.* ¶ 67.

Of these three claims, only two remain "live," and only in part. Relators' Third Claim was dismissed by Judge Thomas A. Flannery on November 10, 1998, because Relators "fail[ed] to identify any agreement between the parties to defraud the government or to engage in any act that could constitute an attempt to defraud the government." *U.S. ex rel. El-Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998). In that same decision, Judge Flannery also held that Relators' First and Second Claims are barred by the applicable statute of limitations insofar as they relate to Medicare claims predating October 24, 1989. *See id.* at 173. In addition, many years later—specifically, on February 25, 2005—Judge John Garrett Penn further narrowed the scope of this action by dismissing Relators' so-called "false concurrency" subspecies of claims, concluding that the allegations in the Complaint failed to meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See U.S. ex rel. El-Amin v. George Washington Univ.*, 2005 WL 485971, at *11 (D.D.C. Feb. 25, 2005).

Today, we are left only with Relators' First and Second Claims, as limited by the aforementioned decisions. To prevail on their First Claim, Relators must show that (1) GWU submitted a claim for payment or approval to the federal government, (2) the claim was false, and (3) GWU knew the claim was false. *See* 31 U.S.C. § 3729(a)(1). To prevail on their Second Claim, Relators must show that (1) GWU created a record and used the record to get the government to pay its claim for payment or approval, (2) the record was false, and (3) GWU knew the record was false. *See id.* § 3729(a)(2). Under either provision, Relators must show that GWU submitted a "claim" to the government, a term that is broadly defined to include any

3

request or demand of money from the government, whether made directly or through an intermediary. *See id.* § 3729(c).

B. **Falsity and the "Seven Steps" Regulation**

In this case, to demonstrate that GWU submitted "false" claims to Medicare, Relators will attempt to show that GWU's anesthesiologists failed to meet the requirements of a billing regulation commonly known as the "seven steps" regulation. *See* 42 C.F.R. § 405.552. Much earlier in this action—specifically, on August 31, 2005—Judge Penn concluded that a physician must perform each of the seven steps for each procedure to be eligible for the highest level of reimbursement and could not delegate performance of those tasks to residents or CRNAs. *See U.S. ex rel. El-Amin v. George Washington Univ.*, 2005 WL 3275997, at *8 (D.D.C. Aug. 31, 2005); *see also* Mem. Order (June 19, 2006), ECF No. [604] (denying GWU's motion for reconsideration). Therefore, for each allegedly false claim, Relators will attempt to show that the attending anesthesiologist failed to satisfy one or more of the seven steps. *See* 42 C.F.R. § 405.552(a)(1)(i)-(vii).

C. **The Fifteen Named Anesthesiologists**

The Complaint includes allegations about the conduct of fifteen named anesthesiologists, but periodically alludes to other, unnamed anesthesiologists. *See* Compl. ¶ 34. On February 25, 2005, Judge Penn found that, together, the FCA and Federal Rule of Civil Procedure 9(b) require "specificity regarding identities of individual actors." *U.S. ex rel. El-Amin v. George Washington Univ.*, 2005 WL 485971, at *6 (D.D.C. Feb. 25, 2005). Judge Penn accordingly held that Relators can pursue "only claims based on the conduct of the fifteen anesthesiologists named," and dismissed "any claims based on the conduct of unnamed anesthesiologists." *Id.* at *7. Judge Penn denied Relators an opportunity to amend their Complaint, noting that "[t]he

4

record clearly reveals that Relators have been on notice of allegations of particular deficiencies in their complaint, having had three opportunities to rectify those deficiencies." *Id.* at *12.

On November 22, 2006, Judge Penn denied Relators' successive motion to amend their Complaint to identify additional anesthesiologists. *See* Mem. Order (Nov. 22, 2006), ECF No. [633]. Judge Penn reasoned that, "[a]fter more than ten years, three separate amended complaints, and several motions to dismiss," Relators had "been given plenty of opportunity to clarify their claims," but still "failed to add to the list of fifteen anesthesiologists that were allegedly involved in the anesthesia procedures at issue, even though they were on notice as to the specific deficiencies in their complaint." *Id.* at 2-4 (quotation marks omitted).

On February 4, 2008, the Court resolved GWU's motion *in limine* to preclude Relators from presenting evidence concerning anesthesia procedures performed by physicians other than the fifteen anesthesiologists named in the Complaint. *See U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 34-35 (D.D.C. 2008). The Court agreed with GWU that "[p]rocedures which were wholly performed by the so-called unnamed anesthesiologists do not have any probative value [regarding] the procedures that were performed, in whole or in part, by the 15 named anesthesiologists." *Id.* at 34. The Court therefore precluded Relators from introducing evidence concerning such procedures at trial. However, the Court did not preclude Relators from introducing evidence concerning "hybrid" procedures—*i.e.*, those procedures in which "a named and unnamed anesthesiologist worked together on the same anesthesia procedure." *Id.*

### D. "Habit" or "Routine Practice" Evidence

Way back in 2000, the parties were in the process of briefing one of what has turned out to be a series of dispositive motions. In connection with that briefing, on May 9, 2000,

5

Magistrate Judge Alan Kay resolved GWU's motion to strike parts of the declarations made by the four Relators. *See* Mem. Order (May 9, 2000), ECF No. [315]. Magistrate Judge Kay agreed with GWU that the Relators' declarations made broad and sweeping generalizations about Medicare billing and procedures about which they clearly had no personal knowledge, as evidenced by their own depositions and GWU's business records. On September 13, 2000, Judge Flannery upheld Magistrate Judge Kay's decision. *See* Mem. Op. (Sept. 13, 2000), ECF No. [398]. First, Judge Flannery found that Relators "admitted they had no knowledge of GWU's billing practices and obviously were disqualified from testifying about these practices." *Id.* at 4. Second, Judge Flannery concluded that Relators could not testify as to "individual doctors or practices" where they "admitted that they had no specific recollection of the facts." *Id.* Third, Judge Flannery rejected Relators' suggestion that they could testify as to GWU's alleged "routine practice" because they had "failed to lay a proper foundation for admission . . . under [Federal Rule of Evidence] 406(a)," and in particular failed to show that the underlying custom or practice was "inflexible," "uniform," or "nonvolitional." *Id.* at 5.

Many years later, these issues resurfaced as the parties prepared motions *in limine* in anticipation of trial. On February 4, 2008, the Court resolved GWU's motion to preclude Relators from offering trial testimony regarding anesthesia procedures in which they were not involved, including any testimony that GWU's anesthesiologists acted according to "habit" or "routine practice." *See U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 25-31 (D.D.C. 2008). Despite the passage of several years since Judge Penn last rejected the notion that Relators could provide such testimony, Relators still failed to "identify the specific practice that is allegedly routine, provide the Court with any evidence that the anesthesiologists' conduct was habitual or uniform, or controvert [GWU's] argument that the anesthesiologists'

6

conduct varied with each patient and procedure, and was therefore not routine." *Id.* at 19. "Even if the Court could comprehend what conduct was purportedly habitual, the Relators [] provided no evidence that would warrant a finding of habit or routine practice." *Id.* at 28. For instance, they failed to "direct the Court to a single piece of evidence, like a deposition or a declaration, that would support this claim." *Id.* For these and other reasons, the Court limited Relators' trial testimony "to those anesthesia procedures of which they have personal knowledge." *Id.* at 31. Further, based on the record then created by the parties, the Court "precluded [Relators] from presenting evidence regarding . . . the habit or routine practice of [GWU] or its anesthesiologists." *Id.* As a result, "Relators cannot broadly assert, as they attempted to do in their declarations, that a particular anesthesiologist virtually never performed the required pre-anesthetic examination or never prescribed the anesthesia plan. Instead, their testimony will be tied to specific Medicare claims for specific patients." *Id.* at 49 (quotation marks and citation omitted).

### E. The Medicare Claims at Issue and the Database of Records

This case has been greatly complicated by the fact that, with few exceptions, the Medicare claim forms at issue no longer exist. Relators initially sought to obtain these forms from GWU itself, but their efforts did not bear fruit because GWU did not have the forms.

Over the years, Relators have from time to time alleged that GWU spoliated evidence by failing to preserve the claim forms, but Judge Penn considered, and rejected, this allegation long ago. On December 13, 2006, he concluded that Relators failed to present "clear and convincing evidence" that GWU "engaged in any misconduct." Mem. Order (Dec. 13, 2006), ECF No. [636] at 5. Specifically, Judge Penn found that Relators failed to satisfy the threshold requirement that "an act of destruction ha[d] occurred." *Id.* Relators identified the electronic

claim forms as the allegedly spoliated evidence, but the record before Judge Penn "show[ed] that the forms were either created internally and saved on magnetic tapes, which were then shipped offsite, or the data was electronically transferred to an outside vendor for processing. In neither instance [was] there evidence that GWU also saved this information on its computers." *Id.* at 7. Judge Penn further suggested that Relators failed to show that GWU acted with the requisite intent, observing that GWU began converting its record-retention system long before the government began its investigation and that, because Medicare claim forms must be retained by the government for a statutorily prescribed period of time, there was little incentive for GWU to destroy its copies. *Id.* at 9-10.

With this avenue foreclosed, Relators proceeded to subpoena third parties, including the Health Care Financing Administration (now known as the Centers for Medicare and Medicaid Services), which routinely stores Medicare claim forms. When the administration failed to respond to the subpoena, Relators traveled to the Federal Records Center in Dayton, Ohio, where the claim forms were supposedly stored. Despite a lengthy manual search, which spanned several weeks, Relators were ultimately able to locate only a few hundred relevant claim forms. As a result, Relators engaged in a lengthy effort to reconstruct the great bulk of the original Medicare claims forms using circumstantial evidence.

Initially, Relators even resisted producing the claim forms that they obtained from their search to GWU, leading GWU to move to compel Relators to produce all relevant Medicare claim records in their possession for the relevant period (October 1989 through October 1995). On November 22, 2006, based largely on Relators' concession that the documents were in fact discoverable, Judge Penn ordered Relators to produce them. *See* Mem. Order (Nov. 22, 2006), ECF No. [632], at 1-2; *see also* Mem. Order (Apr. 30, 2007), ECF No. [688], at 4. Relators

ultimately produced 223 claim forms, only fifty of which identified one of the fifteen anesthesiologists named in the Complaint.

Judge Penn then attempted to move the case towards a final pretrial conference, *see* Order for Pretrial Conference (Dec. 15, 2006), ECF No. [637], but GWU proceeded to file a motion for partial summary judgment seeking to limit Relators' First and Second Claims to those allegedly false claims for which Relators possessed the actual Medicare claim form. In support, GWU argued, in essence, that the Medicare claim form is the sole piece of evidence that can demonstrate that GWU submitted a false claim to Medicare and that nothing less will do. Relators, for their part, conceded that they do not have a Medicare claim form for each claim at issue, but nonetheless maintained that tens of thousands of pages of circumstantial evidence—contained in twenty-two boxes that they filed with the Court—are an adequate substitute. On November 20, 2007, the Court agreed with the basic principle pressed by Relators—namely, that an FCA plaintiff can rely on circumstantial evidence to establish that a claim was submitted to Medicare. *See U.S. ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135, 143 (D.D.C. 2007). "While . . . the FCA requires Relators to prove the existence of a false or fraudulent claim, nothing in the language requires Relators to possess (and present to the factfinder) the actual claim form . . . submitted to the government." *Id.* at 141. The Court also rejected GWU's contention that the "best evidence rule" precludes Relators from relying on anything but the Medicare claim forms to prove the forms' contents. While the best evidence rule applies in this context, Relators are excused from presenting the original forms because "they made a reasonable effort to locate the HCFA claim forms, including serving a subpoena on the HCFA, and that despite their diligent efforts these forms are not obtainable." *Id.* at 146. At

the time of the Court's decision, GWU had "not challeng[ed] the accuracy or reliability of the documentation in Relators' possession." *Id.* at 148.

Nonetheless, there remained a fundamental problem with the expected trial record. Specifically, despite Judge Penn's efforts to get this case ready for trial, Relators had never "adequately defined the universe of claims that are 'in issue.'" *Id.* at 144. On February 4, 2008, in resolving the parties' competing motions *in limine*, the Court stated:

> To date, the Relators have not provided the Court or the Defendant with a list, both comprehensive and exact, of the allegedly fraudulent claims submitted to Medicare. This is no longer acceptable. The Relators will be required, at the upcoming pretrial conference, to identify the exact Medicare claims that were allegedly false. For each claim, the Relators will be expected to provide, at a minimum, [1] the date the claim was filed with Medicare, [2] the name of the attending anesthesiologist, [3] the type of medical procedure involved, and [4] the amount of the claim. The Relators will also be expected to identify each document that they will seek to introduce at trial that corresponds to each allegedly fraudulent claim.

*U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 31 n.9 (D.D.C. 2008).

On February 27, 2008, the Court held a Status Hearing, at which time it directed Relators to "look through the claims and figure out whether [they] have evidence to support it," "indicate the claims [and] indicate the exhibits," "shar[e] the actual exhibits along with the claims," and "associate the claims with exhibits." Tr. of Status Hr'g Before the Hon. Colleen Kollar-Kotelly, U.S.D.J. (Feb. 27, 2007), ECF No. [727], at 15, 25, 30, 35. The Court later memorialized its directions in a written Order:

> Plaintiffs shall identify to Defendants each specific Medicare claim that they allege was false, and shall provide, at a minimum, [1] the date the claim was submitted to Medicare, [2] the name of the attending anesthesiologist, [3] the type of medical procedure involved, and [4] the amount of the claim. Plaintiffs shall also identify, for each allegedly false Medicare claim, any exhibits that they would seek to introduce at trial regarding that claim (for

10

> example, billing records, medical records, and deposition designations).

Order (Feb. 27, 2008), ECF No. [726], at 1.

Relators responded to the Court's Order by creating two rudimentary charts with a word processing program—one for liability and a second for damages. GWU attempted to sift through these charts and believed them to be non-compliant with the Court's requirements. On June 25, 2008, the Court held a Status Hearing to discuss Relators' compliance with the Court's instructions. *See* Tr. of Status Hr'g Before the Hon. Judge Collenn [sic] Kollar-Kotelly, U.S.D.J. (June 25, 2008), ECF No. [736]. During the Status Hearing, the Court observed:

> I entered an order that . . . [Relators] shall identify . . . each specific Medicare claim that they allege was false, provide at a minimum the date of the claim submitted to Medicare, name of the attending anesthesiologist, type of medical procedure and amount of the claim. I also asked that for each of the alleged false Medicare claims that any exhibits [be included] that would . . . be admitted at trial regarding any of these claims to support each of them[:] billing records, medical records or depositions and be very specific. * * * And the purpose of doing this was before getting to the pretrial stage is . . . to at least look at what [Relators'] claims were across the board and what [their] exhibits were and get objections from the defendants, if there were any, so that we can narrow this down and move to the next stage.

*Id.* at 3-4. The Court then proceeded to provide a non-exhaustive list of problems with Relators' submissions:

> I will point out a couple of things. We obviously need the name of the anesthesiologist. I think that you also need the date the claim was submitted. It should not be a guess that it's sort of around the day of the procedure. That's not good enough. Even if you can't show that the claim was paid for purpose of damages you need to show that it was actually submitted for liability. I don't think you can just simply assume that it was [sub]mitted. And as I said there's a fair number of spaces that are empty on the charts where there's no information. I don't see the identifications that I would have expected in terms of persons' depositions. I need the speaker and the testimony page, and the lines so you can figure it out. I have concerns about, you know, the amount of the claim being a

11

> reconstructed fee, how billing might have been done. I don't think
> it's going to work for damages as to what was actually paid so we
> need to look at what proof there is.

*Id.* at 5-6.

At this point, the Court enlisted the assistance of Magistrate Judge John M. Facciola, who has guided the parties in creating an electronic database identifying each Medicare claim and the associated evidence in an attempt to establish a trial-ready record. *See* Tr. of Status Hr'g Before the Hon. Colleen Kollar-Kotelly, U.S.D.J. (Oct. 8, 2008), ECF No. [746]. Ultimately, with Magistrate Judge Facciola's guidance, the parties agreed to split the cost of an outside vendor to create a web-based database that would allow the parties and the Court to access all relevant records in a fluid and dynamic manner (hereinafter the "Database"). *See* Mem. Order (Oct. 22, 2008), ECF No. [741]. As envisioned, the Database would "permit the instantaneous retrieval . . . of the information offered by [Relators] in support of any factual proposition" and "be entirely self-contained so that it can be used without reference to any other information to resolve the questions presented by each claim." *Id.* at 1-2; *see also See* Tr. of Status Hr'g Before the Hon. Colleen Kollar-Kotelly, U.S.D.J. (Oct. 8, 2008), ECF No. [746], at 13-14. The parties subsequently produced a database containing 2,579 total rows, each of which correspond to a medical procedure for which Relators allege that GWU knowingly submitted a false claim or created false records in order to have a false claim paid. *See* Joint Status Report (May 11, 2011), ECF No. [766].

The Court subsequently held several status hearings with the parties to guide them in their use of the Database, including the entry therein of GWU's evidentiary objections and Relators' responses thereto, *see* Mem. Order (Apr. 18, 2011), ECF No. [795]; Min. Order (May 24, 2011); Min. Order (June 21, 2011). On July 13, 2011, the Court entered a Scheduling and Procedures Order for briefing those evidentiary objections, which, as the Court made repeatedly

clear, "should, to the greatest extent possible, be in direct conversation and allow both the parties and the Court to speak to categories of records sharing relevant characteristics." *See* Min. Order (May 24, 2011); Min. Order (June 21, 2011); Scheduling & Procedures Order (July 13, 2011), ECF No. [770].

On August 27, 2012, the Court issued an [778] Order that, *inter alia*, precluded Relators from introducing evidence for 2,162 of the 2,579 total Medicare claims contained in the Database. Specifically, the Court found that for 2,142 of those claims, the four Relators did not personally attend the underlying anesthesia procedures and could not identify any other evidence that they could introduce at trial to establish the essential elements of a violation of the FCA. *See* Mem. Order (Aug. 27, 2012), ECF No. [778], at 21-24. The Court further held that, for several hundred Medicare claims (most of them overlapping with the over two thousand claims already precluded), the Relators had conceded that they offered no evidence or illegible evidence in support of those claims, or that their evidence failed to connect the claims to one of the fifteen anesthesiologists named in the Complaint. *See id*. at 24-30.

The Court declined to rule on the other categorical objections asserted by GWU at that time. Instead, observing that the scope of the record had been substantially narrowed, the Court ordered the parties to cause their outside vendor to remove from the Database the 2,162 Medicare claims for which Relators were precluded from introducing evidence, while preserving them for any appeal. The Court further ordered Relators, to the extent they intend to rely on any testimonial evidence at trial, to enter an "offer of proof" into the Database for each remaining Medicare claim, identifying all the evidence they would seek to introduce at trial to establish each of the essential elements of a violation of the FCA. *Id*. at 30-31. The Court made clear that this offer of proof would serve as Relators' final pretrial presentment; once tendered, the

13

"[D]atabase will set forth, in one form or another, *all* of the evidence (documentary, testimonial, or otherwise) that Relators intend to introduce at trial as to each claim." *Id.* at 31, 33 (emphasis in original). The Court indicated that GWU should respond to the offer of proof and re-raise any objections on which the Court had deferred ruling to the extent they still applied. *Id.* at 31.

After a subsequent hearing and further submissions—during which time the Court "provided Relators one final opportunity to respond to [GW's] objections and direct the Court to [its supporting] evidence in the Database"—the Court issued its June 14, 2013 Memorandum Order precluding Relators from introducing evidence at trial for all but 21 of the remaining alleged false claims in the Database. *See* Mem. Order (June 14, 2013), ECF No. [789] at 9, 37-39. Relators, the Court concluded, had failed to point to any evidence that they could introduce at trial to establish the essential elements of a violation of the FCA for each of these Medicare claims. *Id.* at 12. With regard to the remaining claims in the Database, this Order also required GWU to submit a renewed motion *in limine* addressing the remaining 21 alleged false claims and re-raising any objections on which the Court had not yet ruled. *Id.* at 37.

After receiving briefing from the parties on this issue, the Court ultimately held that these 21 remaining alleged false claims were also not supported by admissible evidence that could establish a False Claims Act violation. *See* Mem. Op. (Aug. 27, 2013), ECF No. [794] at 17. The documents that Relators offered as evidence for these alleged false claims could not be authenticated, nor did they support the propositions for which they were offered. *Id.* Concluding its opinion, the Court found that it was "left with no choice but to conclude that none of the documents in the Database are sufficient to support either of Relators' FCA Claims." *Id.* Accordingly, it ordered the parties to proceed to summary judgment briefing, requesting that

Relators raise any and all additional evidence, aside from the documents in the Database, showing that their claims should be able to go forward to a jury. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that she] . . . is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of her position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### III. DISCUSSION

In light of the many rulings preceding this opinion, the Court has little difficulty in concluding that GWU is ultimately entitled to summary judgment. As the factual background tracing the slow narrowing of this case shows, Relators have not provided any evidence that would be admissible at trial to prove their allegations as to 2,579 medical procedures for which they assert GWU knowingly submitted a false claim. In its August 2012 Order, the Court sustained various evidentiary objections by Defendant and precluded Relators from introducing evidence for 2,162 of the 2,579 total Medicare claims contained in the Database. In its subsequent June 14. 2013 Order, the Court found that Relators had failed to point to any evidence that they could introduce at trial to establish the essential elements of a violation of the

FCA for another 396 claims. Finally, in its most recent ruling, this Court held that the remaining 21 alleged false claims were also not supported by admissible evidence that could establish a False Claims Act violation.[4]

As a result of these rulings, and the rulings coming before them, there is no longer a "genuine dispute as to any material fact" regarding whether GWU knowingly submitted false Medicare claims. In their Opposition brief, Relators point to no additional evidence and offer no argument in support of their claims that has not already been rejected by a prior opinion in this case. Indeed, Relators simply point to their previous arguments in this case, while recognizing the fact that these contentions have already been rejected. *See* Relators' Opp'n. at 5 n.1 ("Relators acknowledge that the Court has excluded or otherwise ruled that all of this evidence as insufficient."); *id.* at 7 n.2 ("Relators acknowledge that the Court has ruled that [the] records do not contain sufficient evidence to prove that it is more likely than not that any of the anesthesia procedures were billed to Medicare.); *id.* at 7 n.3 (acknowledging that Relators' proposed "[w]itnesses do no[t] recall the conduct of particular procedure[s] [at issue] that occurred many years ago" and recognizing that "the Court has excluded 'routine practice' testimony.").

Consequently, in the absence of any admissible evidence in support of Relators' claims, summary judgment for the Defendant is appropriate. *See, e.g., Greer v. Paulson*, 505 F.3d 1306, 1316 (D.C. Cir. 2007) ("Because Greer has proffered no admissible evidence of a sufficient link between the pre- and post-1994 incidents, she has failed to raise a genuine issue that she exhausted administrative remedies for this claim and thus summary judgment was appropriately granted to the Secretary."); *Nessar v. District of Columbia*, No. 12-cv-627, 2013 WL 4516397, at

---

[4] The Database is expected to include the Court's rulings as to all 2,579 Medicare claims and to be available for any appeal should the parties choose to file one.

*4 (D.D.C. Aug. 27, 2013) ("Plaintiff had an opportunity through discovery to develop factual support for the allegations in his Complaint, yet he has failed to do so. With no evidence that any positions were filled in the June-October 2008 time-frame, no genuine issue of material fact remains to justify a denial of summary judgment with respect to [his] claims."). Relators' subjective opinion and conclusory allegations that GWU submitted false claims, in the absence of any admissible evidentiary support, are insufficient to survive summary judgment. *See Association of Flight Attendants–CWA*, 564 F.3d at 465-66 (conclusory allegations are insufficient to defeat a motion for summary judgment); *Dorns v. Geithner*, 692 F.Supp.2d 119, 135 (D.D.C. 2010) (granting summary judgment to defendant because "the plaintiff ha[d] produced no evidence beyond her own subjective opinion" to support her claim). In short, in light of the various motions *in limine* limiting the evidence on which Relators can rely, Relators lack a triable case in this matter. The Court has no choice but to grant summary judgment on the body of evidence (or lack thereof) before it.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's [797] Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

**JOHN M. FACCIOLA**
United States Magistrate Judge